# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| KATHLEEN L. BROWN, | ) |
|---|---|
| Plaintiff, | ) ) ) |
| v. | ) Docket No. 2:17-cv-84-NT ) |
| EDUCATION CREDIT MANAGEMENT CORP., | ) ) ) ) |
| Defendant. | ) |

## ORDER ON PLAINTIFF'S APPEAL FROM A DECISION OF THE BANKRUPTCY COURT

Appellant Kathleen Brown challenges the bankruptcy court's final judgment that her student loans, held by Appellee Education Credit Management Corporation ("**ECMC**"), are non-dischargeable. For the following reasons, I **AFFIRM** the bankruptcy court's determination.

## FACTUAL BACKGROUND

While Brown disputes some of the bankruptcy court's factual findings, the following factual background is not contested. Brown incurred the debt held by ECMC to pay for her law school education. Brown enrolled at the California Western School of Law in January 2001 at the age of 44. She received her Juris Doctor in May 2005. Upon graduation, Brown took a series of accounting jobs to support herself. In 2008, she passed the California bar exam. Once she became a member of the California Bar, Brown took a pro bono position at an elder law non-profit to gain legal experience. In May 2009, approximately six months later, Brown decided to leave this position. She

thought that the organization liked her, but it would never hire her. Brown sought paid legal work in California, including applying to openings for contract attorneys. She received a "number" of interviews, but reported that potential employers told her that she was too old to hire.

Also in or around May 2009, Brown gave her daughter a one-half acre lot that she owned in Camden, Maine. Brown's daughter built a house on the lot, and the total value of the improved property was assessed at $226,000.

In August 2009, Brown was hit by an SUV while crossing the street. She sustained multiple injuries, including a broken ankle.

In May 2010, Brown returned to Maine and was sworn in to the Maine Bar. She had at least one job interview. In June 2010, Brown rented an office space in Kennebunk, Maine for $200 a month and opened a solo law practice. She retained one client, who paid Brown $500 to compose a martial dissolution letter. With no additional clients, Brown closed her law office in July 2011. Since that time, Brown has not sought legal work. She took a part-time position at the non-profit Catholic Charities for $10 an hour.

In 2011, Brown enrolled in nursing school, inspired by the success of her step-brother. Brown testified she did not know how physically demanding nursing would be. Chronic pain, which Brown had experienced since the 2009 accident, and a separate neck injury of unknown origin, hampered Brown's progress in nursing school. She graduated the nursing program in 2013, but then an illness confined

Brown to her bed for the next several months. During that time, she continued to work at Catholic Charities for approximately 15 hours a week.

In November 2014, Brown took and passed the nursing licensing exam. She began working as a nurse at Durgin Pines in Kittery, Maine the following month. Her wage was $26 per hour, and she worked for 25-30 hours a week. Brown left Durgin Pines and took a position at a nursing staffing agency that placed her at nursing homes. Brown found that while this new position had a worse compensation package, it provided her with more support and afforded her greater control over which days and the number of days a week she worked. Brown typically worked two to three days a week, depending on whether she felt able to do more. Brown testified that she looked for less physically demanding nursing jobs, but that she is unqualified for them due to her lack of experience in an acute care hospital setting.

Brown continues to experience severe pain in her neck, right hip, and right ankle. Brown has never applied for Social Security Disability Insurance ("**SSDI**"), and she does not have a prescription for pain medication.

The bankruptcy court determined that Brown's gross income in 2015 was $32,530.50 and that this amount barely covered her most basic living expenses. Brown also has deferred necessary and significant medical, dental, home, and car expenses. At the time of the trial, Brown projected that her 2016 income would be lower. She also expressed a plan to start drawing from her social security benefits in 2017 at the age of 62 and to cut back the hours she works.

## PROCEDURAL HISTORY

Brown filed for Chapter 7 bankruptcy in February 2015. The bankruptcy court held an evidentiary hearing on September 23, 2016. Brown proceeded pro se and was the sole witness. On February 24, 2017, the bankruptcy court issued its final determination that Brown failed to establish sufficient evidence of hardship to justify discharge of her student loans. In making this determination, the court declined to credit some of Brown's testimony on the basis that it was contradictory or improbable. Brown timely appealed that determination and opted to file her appeal with the District of Maine.

## LEGAL STANDARD

When a district court reviews a bankruptcy court's final judgment on appeal, the district court may affirm, modify, reverse, or remand the judgment. *Crawford v. Riley (In re Wolverine, Proctor & Schwartz, LLC)*, 436 B.R. 253, 260 (D. Mass. 2010). Questions of law are reviewed de novo, while the underlying factual findings must stand unless they are deemed clearly erroneous. *Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon)*, 435 B.R. 791, 796 (2010). In reviewing an appeal, courts should give "due regard . . . to the opportunity of the bankruptcy court to judge the credibility of the witnesses." *Palmacci v. Umpierrez*, 121 F.3d 781, 785 (1st Cir. 1997).

## DISCUSSION

The question on appeal is whether Brown failed to satisfy her evidentiary burden to show repayment of her student loan would pose an undue hardship.

4

I. **Dischargeability of Student Loans**

Under the Bankruptcy Code, student loans are not subject to the general rule of dischargeability, but rather a student loan may be discharged only where the debtor can show that payment of the debt "would impose an undue hardship on the debtor." 11 U.S.C. § 523(a)(8). Courts employ a burden-shifting analysis for the undue hardship inquiry. First, the creditor bears the burden of showing that the debt is the type excepted from discharge under § 523(a)(8). *Educ. Credit Mgmt. Corp. v. Savage (In re Savage)*, 311 B.R. 835, 837 (B.A.P. 1st Cir. 2004). Here, the parties agree that Brown's student loans are regulated by § 523(a)(8). The burden therefore shifts to the debtor to show that not discharging this debt would cause the debtor and her dependents "undue hardship." *Id.*

Most courts in the First Circuit analyze the existence of an undue hardship under the totality of the circumstances test.[1] A debtor must:

> prove by a preponderance of evidence that (1) his past, present, and reasonably reliable future financial resources; (2) his and his dependents' reasonably necessary living expenses; and (3) other relevant facts or circumstances unique to the case, prevent him from paying the student loans in question while still maintaining a minimal standard of living, even when aided by a discharge of other prepetition debts.

*In re Bronsdon*, 435 B.R. at 798. "Whether the failure to discharge a student loan will cause undue hardship to the debtor and the dependents of the debtor under

---

[1] In the prior proceeding, ECMC requested that the court apply a different undue hardship test, set out in *Brunner* and employed in nine other circuits. *See Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987). On appeal, however, the parties do not challenge the application of the totality of the circumstances test.

§ 523(a)(8), rests on both the economic ability to repay and the existence of any disqualifying action(s)." *Id.* at 800.

In this case, the bankruptcy court concluded that Brown did not meet her evidentiary burden of showing that her future financial circumstances would prevent her from repaying her loans and maintaining a minimum standard of living. In particular, the court found:

> her testimony was less credible with respect to her reasonably reliable future income. While the Plaintiff's age and physical limitations certainly pose challenges, her often conflicting testimony regarding her employment history suggests that the Plaintiff's most significant obstacle to gainful employment is not her age, gender, or physical limitations but, rather, her unrealistic expectations that reasonable employment must be flexible, comfortable, enjoyable and lucrative.

Bankr. Ct. Op. 8 (ECF No. 1-4). The court further noted that Brown:

> appears to have the skills and licensing necessary to obtain employment in two well-paying professions. If her inability to find reliable employment is premised upon a medical ailment, rampant age or gender discrimination, or a lack of qualifications, then the ECMC loans should be discharged. If, however, the Plaintiff's current employment situation is more indicative of an unwillingness to work regularly, a lack of effort in finding steady employment or a far too limited job search, then a hardship discharge is not appropriate. Regardless, the Plaintiff bears the burden of establishing by a preponderance of the evidence that her reasonably reliable future income justifies a hardship discharge and she has not met that burden.

Bankr. Ct. Op. 10. The bankruptcy court concluded that Brown's student loan debt could not be discharged.

## II. Findings of Fact

Brown's appeal primarily challenges the bankruptcy court's factual findings on her job search efforts, decision to end her volunteer legal job, experiences with age discrimination, decision to start nursing school, and preference to work two days a

6

week. Brown argues that on these various points that the record was sufficiently developed and consistent. In the following section, I review these findings for clear error.

### A. Failure to Build the Record on Job Search Efforts

To begin, the bankruptcy court found that the record lacked sufficient evidence of Brown's efforts to find gainful employment and also contained opposing evidence of Brown's unwillingness to work longer hours in more lucrative positions. Bank Ct. Op. 10. First, with regard to Brown's job search efforts, the court found that Brown relied on generalized comments about networking, making it "simply impossible to determine, based on the limited evidence presented by the Plaintiff, how many applications she submitted, the type of openings to which she applied, or the length of time she actively engaged in the job search." Bankr. Ct. Op. 9.

Brown argues that the record shows that she made hundreds of contacts with employers and that she demonstrated a willingness to relocate and seek employment in alternate fields. Appellant's Br. 10 (ECF No. 9). Brown refers to testimony in which she said that she spent two years in California "pounding the pavement" in search of legal employment and was "constantly" applying for contract work. Hearing Tr. Sept. 23, 2017 at 59:3-4; 63:1-3 (ECF No. 12-1).[2] Brown testified that this included:

> going on interviews, putting ads on Craigslist, answering ads, calling people, networking. I didn't do an outstanding job networking but I did do some networking. I went to meet and greets. I was a member of the

---

[2]   I refer throughout to the complete transcript, as filed by ECMC. Brown filed an incomplete and nonsequential version of the transcript that followed different pagination. (ECF No. 9-4.) When needed, I have substituted citations to the complete transcript where Brown cited to her version of the transcript.

7

> San Diego County Bar. And they had mixers so I went there. I was consistently told I, you know, I was too old.

Hearing Tr. 59:4-9. She interviewed for positions, but was not hired. Hearing Tr. 63:7-11. Brown also testified that she explored private practice by networking with a woman who had started her own successful practice, although she concluded that she could not manage the effort that seemed to require. Hearing Tr. 63:12-64:5. Finally, Brown testified that she received California unemployment compensation, which required her to show that she was searching for work. Hearing Tr. 61:11-16. Brown suggests that the bankruptcy court could have inferred some of the specifics that it found not to be in evidence from her testimony about receiving unemployment benefits. *See* Appellant's Br. 8-9.[3]

Under the clearly erroneous standard of review, it is not a proper role of the court to impose alternative factual inferences from a limited record. Brown's argument does not show clear error in the bankruptcy court's factual finding that the record does not reflect "how many applications she submitted, the type of openings to which she applied, or the length of time she actively engaged in the job search." *See* Bankr. Ct. Op. 9.

Brown's final argument regarding her job search efforts is that they were comparable to those of the debtor in *Bronsdon*. Appellant's Br. 10 (citing *Educ. Credit*

---

[3] For example, Brown testified that she lost a contract accounting job in June 2008 and left for Maine in 2010 when she "ran out of money." Hearing Tr. Sept. 23, 2017 at 60:8-9 (ECF No. 12-1). On this basis, the bankruptcy court could have inferred that she qualified for unemployment for the entire 99 weeks allowed under the law. Appellant's Br. 8-9 (ECF No. 9) (citing to a National Bureau of Economic Research paper not otherwise in the record). In addition, Brown suggests that the court could have inferred that she made five contacts with employers per week for each of the 99 weeks, totaling 495 contacts. Appellant's Br. 9.

8

*Mgmt. Corp. v. Bronsdon*, 421 B.R. 27 (D. Mass. 2009)). In that case, the district court determined that the bankruptcy court's findings of fact were not clearly erroneous because there was "ample evidence" that Bronsdon was "an industrious individual." *Bronsdon*, 421 B.R. at 29, 32. The district court also affirmed that Bronsdon's future income was limited to her Social Security payment. *Id.* at 32. This was because "[t]he record show[ed] a pattern of gradually decreasing employability followed by a prolonged unemployment, despite a broad and vigorous job search and increasing education and work experience." *Id.* Bronsdon failed the Massachusetts bar exam three times by a substantial margin, and so she would never work as an attorney. *Id.* at 33. In addition, Bronsdon worked as a legal secretary until she was involuntarily terminated and then took temporary positions. She "continually" went on interviews, made phone calls, and spoke with employment agencies. *Id.* at 30. She also wrote a novel and applied for a patent. *Id.*

Even though Bronsdon and Brown are both in their sixties and saddled with law school debt, their cases are not easy to compare. First, clearly erroneous is a relatively high standard, and in *Bronsdon*, the district court affirmed—rather than reversed—the bankruptcy court's findings. Second, Bronsdon convinced the court that she could never find a legal job but that she persevered on alternative paths, whereas Brown's job search and decision to stop pursuing her legal career was not satisfactorily established or explained.

The bankruptcy court also noted that Brown's decision to quit Durgin Pines and to work instead for a nursing staffing agency hurt her ability to repay her student

9

loans. The judgment continued "it does not help the Plaintiff's case that she refuses to work directly for nursing homes or similar facilities, notwithstanding her ability to qualify for these higher paying jobs, because she finds it more enjoyable to work for staffing agencies." Bankr. Ct. Op. 9-10. Underlying this statement were comparisons that the bankruptcy court made about the number of hours the two employers asked Brown to work[4] and her compensation in either nursing position.[5]

---

[4]  The bankruptcy court found that Durgin Pines required Brown to work a minimum number of hours per week, while the staffing agency allowed Brown to "pick and choose" the days that she worked. Bankr. Ct. Op. 5. Brown argues that while she testified that she worked 25-30 hours a week at Durgin Pines to complete her orientation training, after her training was complete, she would not have had set hours or work days. Appellant Br. 18-19. At the same time, however, Brown argues that she left Durgin Pines "as soon as she had enough experience," and sought out the support and flexibility of the staffing agency, where she could work two days a week. *See* Appellant's Br. 19. Because the record does not indicate what Brown's work requirements would have been at Durgin Pines had she stayed, there are no grounds to find error in the bankruptcy court's determination on this point.

Similarly, the bankruptcy court found that "[s]ome of the other nurses at the staffing agency work 40-60 hours per week and the staffing agency continuously requests that their nurses work more hours." Bankr. Ct. Op. 5. Brown testified "I'm just not able to do much more than two days a week. They keep pressuring me to take more hours, but I can't do it." Hearing Tr. 42:15-16. Brown argues now that the pronoun "they" referred to the management of the nursing home where the staffing agency placed her, and not to the staffing agency itself. Appellant Br. 20 n.22. This clarification is not supported by the record; at best the subject of the pronoun "they" in her testimony is undefined. Further, Brown testified that other staffing agency nurses work up to 32 hours and direct employees of the nursing homes can work at least 40 hours. Hearing Tr. 71:5-14. This indicates that Brown is working less hours than both categories of employee. The pronoun "they" reasonably could be interpreted as the staffing agency that employs her asking Brown to work more than two days a week.

[5]  The bankruptcy court found that Brown left a $26 per hour job at Durgin Pines to accept a $20 per hour job at the staffing agency with a smaller compensation package and fewer incentives. Bankr. Ct. Op. 4-5. Brown argues that this hourly wage is incorrect because she earned $28 per hour at the staffing agency, a $2 increase in her hourly wage. *See* Hearing Tr. 41:16; *see also* 119:9-10. Because the record contains reference to Brown earning $28 per hour at the staffing agency and does not contain a reference to her earning $20 per hour, I find that the bankruptcy court made an error on this fact. On the broader conclusion, however, that a nurse like Brown could "do better financially if he or she were employed directly by a facility such as Durgin Pines," Brown has not shown error. *See* Bankr. Ct. Op. 9. Brown testified that Durgin Pines had the better "compensation package," including pay incentives for working a shift over the weekend and stronger employee benefits. Appellant Br. 21 n.23; *see also* Hearing Tr. 39:14, 75:25-76:4. Brown also testified that nurses could work more than 40 hours a week as direct employees of nursing facilities like Durgin Pines and earn overtime. *See* Hearing Tr. 71:3-14. Accordingly, I do not find clear error on this point.

Brown argues against this factual finding, stating that her preference for the "advocacy" she gets at the staffing agency does not reflect a poor work ethic. Appellant's Br. 19-20. This is a straw man argument, however, and Brown fails to show error in the bankruptcy court's characterization of Brown's testimony regarding her preferences and her choice to work for the less time-demanding and less well-compensated employer. This factual finding was not clearly erroneous.

### B. Inconsistent and Incredible Testimony on Age Discrimination

The bankruptcy court also found that the evidence Brown developed suffered from self-defeating contradictions. For example, the bankruptcy court found Brown's "testimony regarding her employment prospects at [the California elder law] non-profit" inconsistent.

> On the one hand, she testified that she ceased working for the organization after six months because it became apparent the organization would never hire her due to her age. In support of this claim, the Plaintiff testified that the organization hired a younger male attorney during that same six-month period; clearly implying she was passed over for the paid position. On the other hand, the Plaintiff testified that new-hires were expected to work one year without pay before being hired for paid positions and acknowledged that the co-worker hired ahead of her satisfied that requirement.

Bankr. Ct. Op. 2-3.

Brown's challenge to this factual finding is unavailing. First, she argues that the non-profit "told" her it would not hire her "because" it had hired a younger attorney. Appellant's Br. 11. However, her testimony at the evidentiary hearing was "it was pretty obvious to me they weren't going to hire me. They liked me, they gave me a great reference and everything, but they, they wanted somebody younger. In

11

fact, while I was there doing pro bono work, they hired a young guy." Hearing Tr. 61:4-8. This inexactitude undermines Brown's argument on behalf of her consistency.

Moreover, Brown's observation that job seekers worked without pay for a year, which she offered to explain why the non-profit did not hire her, undermined her assertion that after six months there she knew the organization would never hire her because of her age.[6] Brown testified to several other reasons that motivated her departure from the elder law non-profit, including that the commute had become a financial drain, her car needed repair, and she needed to earn an income. *See* Appellant's Br. 11; Hearing Tr. 62:6-8. Brown therefore fails to show clear error in the determination that she gave contradictory statements.

In addition, the court found that Brown's account of widespread, overt age discrimination "strains credulity" because "[i]t seems improbable that all of these prospective employers—employers engaged in the practice of law—would be so universally insensitive to the inherent risk of liability under applicable employment discrimination laws as to make explicit reference to the Plaintiff's age as a

---

[6] Brown testified that the elder law non-profit:

> just wasn't going to hire me. Not that they didn't like my work, but they just weren't going to do it. So oddly enough, just as an aside, I guess, but this kind of flushes out why they didn't hire me out there. It's not uncommon for people to have to work for a full year. That seems like the magic year – full year – without pay before they'll carve out a position for you. I know somebody who worked for this city attorney's office in San Diego. She had to work there a year (indiscernable) create a position. And one of the attorney's in that agency where I was doing the volunteer work worked there a year for free before they hired him. So it's kind of a quirky thing that they do out there.

Hearing Tr. 61:17-62:5.

Brown also argues that the bankruptcy court incorrectly assumed that the new hire at her non-profit was the same person as the new-hire who had worked a year without pay, when they were in fact two different people. Appellant's Br. 12. This distinction is not material.

12

determinative factor in the hiring process." Bankr. Ct. Op. 9. Brown's testimony included a statement, for example, that in California:

> [e]verything is "the look" out there. And I didn't have the look. I mean, they're brazen. They'll tell you that. They were just shameless. "You're too old." And honestly, I said, "why did you"— (indiscernible)—ask "why did you give me the interview?" They'd be "oh, we just wanted to see what you look like." Because if I had the look, I would have gotten the job.

Hearing Tr. 65:3-9. Brown contends the bankruptcy court's finding was in error because age discrimination is prevalent in the legal field. Brown supports this argument with assertions that (1) an attorney at the elder law non-profit told her that she had a "non-existent" chance of finding work in the state, (2) the California state bar did a study of age discrimination, and (3) the *New York Times* published article on age discrimination in the legal field. Appellant's Br. 13-14. These three facts are not supported by citations to the record, however, and cannot be considered on review of the bankruptcy court's factual findings. Moreover, Judge Cary's finding was not that age discrimination was implausible, but that Brown's broad claims of discrimination did not satisfy her evidentiary burden. Giving "due regard" to Judge Cary's judgment of Brown's credibility, I do not find that this determination was clear error. *See Palmacci*, 121 F.3d at 785.

### C. Compound Credibility Issues Undermine Disability Testimony

Brown stated in her testimony, and reiterated in her appellate brief, that she has chronic pain, which makes her working just two days a week appropriate and limits her future employment options. Medical expert testimony may not be required to establish a physical disability. *See Ackley v. Sallie Mae Student Loans (In re*

13

*Ackley)*, 463 B.R. 146, 150 (Bankr. D. Me. 2011) (the court did not require medical expert testimony to find health conditions would not improve based on viewing and hearing the debtors describe their ailments). In this case, however, the bankruptcy court determined that Brown's "contradictory statements raise credibility issues and, therefore, some evidence beyond her own anecdotal testimony would have been helpful in establishing the limiting effect of her numerous medical ailments." Bankr. Ct. Op. 10.

In *In re Nash*, the First Circuit also declined to rely solely on a debtor's testimony about her disability. *Nash v. Conn. Student Loan Found. (In re Nash)*, 446 F.3d 188 (1st Cir. 2006). There, the debtor testified that "her chances of 'stabilizing continuously'" were "not very good," but the government presented evidence that her condition could be stabilized with effective treatment, and so the court found her testimony about her future was "necessarily speculative." *Id.* In addition, Nash had secured temporary SSDI, but, because this disability determination was temporary, the court found lacking "any reliable evidence of future inability to work". *Id.* at 192-93. Here, Brown has not applied for SSDI and does not have pain management prescriptions. Without evidence to support Brown's assertion beyond her testimony, I defer to the bankruptcy court's credibility determination. *See Palmacci*, 121 F.3d at 785.

## III. Questions of Law

Finally, Brown argues that the bankruptcy court improperly considered good faith and morality judgments, contrary to First Circuit precedent that no "textual foundation" exists for a "good faith requirement" in the context of § 523(a)(8). *In re*

14

*Bronsdon*, 435 B.R. at 800. In particular, Brown argues that the bankruptcy court improperly weighed her decision to give away—rather than sell—her half-acre lot in Camden, Maine and her plan to "take early retirement" and start withdrawing from Social Security at age 62. Appellant's Br. 24-27.

Brown's legal argument is unavailing because the bankruptcy court expressly did not reach this issue. The bankruptcy court relegated its discussion of the Camden lot and "early retirement" to a footnote, noting that because Brown otherwise had not satisfied the inability to repay prong of the *Bronsdon* test, the court need not decide whether either of these two incidents constituted a "disqualifying factor" under § 528(a)(8). Bankr. Ct. Op. 10 n.6; *see also In re Bronsdon*, 435 B.R. at 800 (the party opposing discharge of a student loan could present evidence of "any disqualifying factor, such as bad faith"). I need not a review a question of law raised but not answered by the bankruptcy court.

## CONCLUSION

For the reasons stated above, the Court **AFFIRMS** the bankruptcy court's final judgment.

SO ORDERED.

/s/ Nancy Torresen  
United States Chief District Judge

Dated this 12th day of December, 2017.

15